AAS:JEA/EAH
F. #2019R01179

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

IN THE MATTER OF AN APPLICATION
FOR A SEARCH WARRANT FOR:

THE PREMISES KNOWN AND
DESCRIBED AS THE FIRST FLOOR AND
BASEMENT OF 29-11 BUTLER STREET, EAST
ELMHURST, NEW YORK 11369 AND ALL
COMPUTERS, CELLULAR TELEPHONES AND
ELECTRONIC STORAGE MEDIA CONTAINED
THEREIN

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR A
SEARCH WARRANT

19 M 777

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

MICHAEL VECCHIONE, being duly sworn, deposes and states that he is a

Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to

law and acting as such.

Upon information and belief, there is probable cause to believe that there is

currently contained and concealed within THE PREMISES KNOWN AND DESCRIBED

AS THE FIRST FLOOR AND BASEMENT OF 29-11 BUTLER STREET, EAST

ELMHURST, NEW YORK 11369 (the "SUBJECT RESIDENCE") AND ALL

COMPUTERS, CELLULAR TELEPHONES AND ELECTRONIC STORAGE MEDIA

CONTAINED THEREIN (the "SUBJECT PREMISES"), located within the Eastern District

of New York and further described in Attachment A, the things described in Attachment B,

which constitute evidence, fruits and instrumentalities of attempting to provide material

support or resources to a designated foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B (the "Subject Offense").

The source of your deponent's information and the grounds for his belief are as follows:[1]

## I.   INTRODUCTION

1.   I am a "federal law enforcement officer" within the meaning of the Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2.   I have been a Special Agent with the FBI for approximately two years. I am currently assigned to the Joint Terrorism Task Force ("JTTF") and, specifically, to a squad responsible for investigating terrorism-related threats and related violations of law. As a Special Agent, I have investigated numerous matters during the course of which I have conducted physical surveillance, interviewed witnesses, executed court-authorized search warrants and used other investigative techniques to secure relevant information. As a result of my involvement in counterterrorism investigations, as well as my training in counterterrorism, I am familiar with the tactics, methods, and techniques of persons engaged in terrorism-related offenses. I am also familiar, through my training and experience, with the use of computers and phones in criminal activity and the forensic analysis of electronically stored information.

---

[1] Because the purpose of this affidavit is to set forth only those facts necessary to establish probable cause for a search warrant, I have not described all the relevant facts and circumstances of which I am aware.

2

3.      This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI").   Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.   Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

II.     DESCRIPTION OF THE SUBJECT RESIDENCE

4.      The SUBJECT RESIDENCE is located within a blue and white house (the "House") located on 29-11 Butler Street, East Elmhurst, New York, surrounded by a white fence.   The House is accessed via a walkway past the white fence and up a few stairs on the right side of the House.   The front of the House has the numbers "2911" in black lettering on a white column.   For the reasons described below, the Subject Residence is believed to be located on the first floor and basement of the House.   The SUBJECT RESIDENCE is believed to be occupied by AWAIS CHUDHARY ("CHUDHARY") and his family.   Indeed, a police report, dated on or about March 2, 2018, lists CHUDHARY's address as Apartment 1F of the House.   Based on my review of a recent Con Edison report, I have learned that Shouket Chudhary, CHUDHARY's father, is the customer of the House's first floor residence.   Furthermore, based on my review of United States Postal Service records, I have learned that multiple packages have recently been sent to the House, addressed to individuals with the last name "Chudhary", none of which have listed a unit

3

number.   In addition, one package, which was addressed to the House's second floor, is listed to an individual who does not have the last name Chudhary.

5.      Surveillance has shown CHUDHARY entering and exiting the House at various points between on or about August 24, 2019 and on or about August 29, 2019. Based on my and other law enforcement agents' review of a zoning analysis on file with the New York City Department of Buildings, that appears to propose a floor plan for the House, it appears that the residents of the bottom floor of the House have unrestricted access to the House's entire first floor and the basement level.[2]

III.   THE ISLAMIC STATE OF IRAQ AND AL-SHAM ("ISIS")

6.      During the course of my participation in counterterrorism-related investigations, I have become familiar with ISIS through a variety of sources, including, but not limited to, FBI investigations of ISIS, persons associated with ISIS, and open-source news coverage of ISIS.   In the course of my duties and responsibilities, and through my involvement in this investigation, I have learned the following, in substance and in part:

a.      On or about October 15, 2004, the U.S. Secretary of State designated al Qaeda in Iraq ("AQI"), then known as Jam 'at al Tawhid wa' al –Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act (the "INA") and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.   On May 15, 2014, the Secretary of State amended the designation of AQI as a

---

[2] A male individual has on at least two occasions during agents' surveillance returned to the House—at approximately 3:15 a.m. on August 24, 2019 and approximately 2:15 a.m on August 27, 2019.   After the male individual returned on August 24, 2019, surveillance observed the lights on the second floor of the House turn on.   Accordingly, it appears that that individual resides on the second floor of the House—that is, in a part of the House that is not the SUBJECT RESIDENCE.

4

Specially Designated Global Terrorist entity under Section l(b) of Executive Order 13224. On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 and as a Specially Designated Global Terrorist entity under Section 1(b) to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name.   The Secretary of State also added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham (abbreviated as ISIS, which is how the FTO is referenced herein), The Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production.   On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO.

b.  Based on my participation in this investigation and my review of open-source reporting, I know, among other things, that on or about September 21, 2014, ISIS spokesperson Abu Muhammad al-Adnani issued a recorded statement calling for attacks against citizens— civilian or military—of the countries participating in the United States-led coalition against ISIS.

c.  ISIS members and associates make and have made public statements and issued public declarations, which, among other things, (i) proclaimed and acknowledged that ISIS had committed acts of violence; (ii) threatened future acts of violence if ISIS's demands were not met; and (iii) were intended to promote and foster the prestige and standing of ISIS.   ISIS has claimed responsibility for the following terrorist attacks, among others: (i) on or about November 13 and 14, 2015, a group of attackers carried out attacks in Paris, France, which killed approximately 130 people; (ii) on or about March 22, 2016, a group of attackers carried

out bombings in Brussels, Belgium, which killed at least 32 people; and (iii) on or about July 14, 2016, an attacker used a truck to run over civilians in Nice, France, killing more than 80 people and injuring more than 300.

d. To gain supporters, ISIS, like many other terrorist organizations, spreads its message using social media, Internet platforms, and email. Using these platforms, ISIS posts and circulates videos and updates of events in Syria, Iraq, and other ISIS-occupied areas, in English, Arabic, and other languages, to draw support to its cause. ISIS has disseminated a wide variety of recruiting materials and propaganda through social media, which includes photographs and videos depicting ISIS activities, including beheadings and other atrocities, as well as audio and video lectures by members of ISIS and members of other Islamic extremist organizations.

IV.     PROBABLE CAUSE TO SEARCH THE SUBJECT PREMISES

8.      On August 29, 2019, AWAIS CHUDHARY was arrested at a mall in Flushing, Queens, while attempting to obtain a knife to be used in a "lone wolf" style terrorist attack. At the time of his arrest, CHUDHARY was found in possession of, among other things, two cellular telephones and a backpack containing a prayer rug, pens, a water bottle, an identification card listing the address of the House (*i.e.*, 29-11 Butler Street, East Elmhurst, New York) as CHUDHARY's address, and a pair of scissors. At the time of CHUDHARY's arrest, he was not in possession of a computer or a scooter. As discussed below and based on surveillance conducted in the case and the defendant's own statements, there is probable cause that the computer and scooter, which both contain or are evidence of the Subject Offense, are presently located in the SUBJECT PREMISES.

6

## CHUDHARY'S PLAN TO COMMIT AN ATTACK FOR ISIS

9.      Beginning on or about August 23, 2019, an individual subsequently identified as AWAIS CHUDHARY, conversed with a law enforcement officer acting in an undercover capacity ("UC-1"), who was posing as an online supporter of ISIS, through a text messaging application ("Application-1").   Since that time, CHUDHARY has been in regular correspondence with UC-1 on Application-1 and a second text messaging application (Application-2").   CHUDHARY has also communicated with another law enforcement officer acting in an undercover capacity ("UC-2") through text messaging.   In his communications with UC-1 and UC-2, CHUDHARY repeatedly expressed his support for ISIS and his desire to conduct a terrorist attack in the Eastern District of New York.

10.      Based on my review of screenshots of CHUDHARY's communications with UC-1 and UC-2, I have learned that, from on or about August 23 through 25, 2019, CHUDHARY communicated with UC-1 regarding his plan to conduct a stabbing or bombing attack on behalf of ISIS in the United States.

11.      On or about August 23, 2019, CHUDHARY requested information from UC-1, preferably a video, regarding "the proper knife" for committing a stabbing attack, as well as information regarding "how to not leave traces of finger prints, DNA, etc." CHUDHARY indicated that he needed that information because he was "in the west." CHUDHARY further stated that he was asking Allah to, among other things, "not let us get caught or imprisoned, for indeed the entire plot belongs to Allah alone."

12.      During that same conversation, CHUDHARY explained that he intended to commit a knife attack "because that's what [he] know[s]," but that if UC-1 could

7

instruct him "on how to build a bucket bomb," CHUDHARY would consider a bombing attack as well. I believe that CHUDHARY was using the term "bucket bomb" to refer to an explosive device.

13. Later in the conversation, CHUDHARY stated that he needed to know the best way to make a bomb "swift with no traces left behind." He further explained that, as possible targets for an attack, he was considering a "quiet and darker area that's near a wide river where people pass," or a "mini bridge over a busy road with many cars." CHUDHARY stated that the latter location was why he had "mentioned the bucket bomb" in order "to target multiple vehicles." When asked what kind of attack he wanted to conduct, CHUDHARY responded that he intended to commit the attack as a lone wolf. I understand that a "lone wolf" attack refers to a terrorist attack committed by a single individual.

14. CHUDHARY also stated during the conversation with UC-1 that he had given "ba'yah to Ameer al-Mu'mineen." I am aware that "bay'ah" refers to a pledge of allegiance and that Ameer al-Mu'mineen refers to the leader of ISIS, Abu Bakr al Baghdadi.

15. UC-1 thereafter requested that CHUDHARY send photographs of the locations that he was considering for an attack. CHUDHARY explained that he did not have a proper knife for the attack and needed to know the name of the type of knife required. He also wrote that he had viewed an image of "the ideal knife," which depicted a hand guard on the knife.

16. CHUDHARY then explained that he had taken videos of the locations an hour earlier and that he was sending a video to UC-1. CHUDHARY stated that the video depicted the bridge he had mentioned earlier and that he "was thinking about simply

8

throwing bucket bomb or several light weight bombs at the car over the fencing but the problem is I do not know how to make them." CHUDHARY further stated that he was sending another video to UC-1 depicting the "knife area," and noted that the video files were large because he had recorded them with his cellphone. Because of the size of the files recorded by CHUDHARY, UC-1 directed CHUDHARY to send the videos to another account which UC-2 controlled.

17.     CHUDHARY thereafter sent videos of the attack locations to UC-2: (1) a video depicting a bridge, (2) a video entitled "First Portion after bridge," and (3) a video entitled "Third Portion after bridge." CHUDHARY explained that the videos depicted the location he was considering for a knife attack. He further stated that he was considering targeting "the vehicles by throwing the bucket bomb or light weight explosives over the fencing at the vehicles." I have reviewed the videos of the proposed attack locations, which included videos of the pedestrian bridges over the Grand Central Parkway to the Flushing Bay Promenade (the "Promenade") in Queens, New York.

18.     On or about August 23, 2019, CHUDHARY sent UC-2 a screenshot of a document with the words "Islamic Stat[e]" at the top and the subheadings "Places to Strike," "The Ideal Knife," and "Knives to Avoid." The instructions further included a diagram of the human body depicting where to stab victims with a knife. CHUDHARY also sent UC-2 two videos depicting bomb attacks. After sending the first video, CHUDHARY wrote, in an apparent reference to the bomber depicted in the video, "This is what I mean by bucket bomb or something hefty as you see he placed it and then moved away for its hefty explosion with the grace of Allah." After sending the second video, CHUDHARY wrote,

9

"And this is what I mean by a light weight easy to carry explosive."   CHUDHARY then

asked UC-2 to download the videos of the attack locations and asked UC-2 to "please watch

them" in order to view "the terrain/land/structure."   At least one of the bombing videos that

CHUDHARY sent to UC-2 appeared to be produced by ISIS, featuring a graphic of an ISIS

flag in the upper left-hand corner.

    19. On or about August 24, 2019, CHUDHARY and UC-1 communicated

through text messages.   CHUDHARY stated that he had selected the attack locations

because they seemed to have "easier escape routes" and "more room for [CHUDHARY's]

scooter."   CHUDHARY then sent a photograph of a scooter.   Later in the conversation,

UC-1 noted that CHUDHARY could die in an attack if he was not able to escape and asked

CHUDHARY whether he was "ok" with dying.   CHUDHARY replied affirmatively and

stated, "May Allah not turn our hearts away or make us ever doubt or hesitate."   During

surveillance, law enforcement officers observed CHUDHARY utilizing a scooter after

exiting the House.

    20. CHUDHARY thereafter explained his timeline for procuring supplies

to conduct an attack.   CHUDHARY stated that he wanted to start with acquiring a knife,

"because buying materials for explosives . . . bring suspicion by the crusaders and their

miserable worshipers."   CHUDHARY further explained that he had searched the website of

an online retailer ("Online Retailer-1") for the knife he wanted to use in the attack but could

not find the "proper knife."   CHUDHARY asked UC-1 to suggest the name of the knife he

would need and asked whether he would also need gloves and a mask.   After UC-1 sent

CHUDHARY a photograph of a knife, CHUDHARY noted that "buying a knife like this

draws attention."

21.     Later in the conversation, CHUDHARY provided further details regarding his attack plans.  CHUDHARY explained that he was considering an attack at 4:00 p.m. in the afternoon because "this is when it's most crowded" in the targeted areas he intended to attack.  CHUDHARY also sought guidance from UC-1 regarding the use of "medical latex gloves" during the attack, and whether wearing such gloves would "not leave fingerprints and DNA."  CHUDHARY further requested videos from UC-1, including "training videos on how to effectively use knife and training in general . . . as training for Jihad for Allah is worshiping in itself."  CHUDHARY also informed UC-1 that he believed there were surveillance cameras located in the vicinity of "the gas station and donut shop and restaurant" near one of the attack locations he was considering, and offered to make additional video recordings of the area for UC-1 to view.

22.     Based on my review of records from open-source databases, I have learned that a particular cellphone number account is associated with the text messaging application the defendant AWAIS CHUDHARY used to communicate with UC-1 and UC-2 (the "Phone Number").  Further, based on a search of a law enforcement database, I have learned that the user of the Phone Number is reflected as CHUDHARY.[3]  The database also listed the address of the SUBJECT PREMISES (the "Address") as associated with

---

[3] I have learned that the subscriber of the Phone Number is an individual with the last name "Chudhary," but a different first name.  Based on the fact that the subscriber has the same last name as CHUDHARY, it appears that one of CHUDHARY's relatives is the subscriber of the phone used to register CHUDHARY's account on Application-1.  Based on cellphone location data associated with the Phone Number as compared with law enforcement agents' physical surveillance of CHUDHARY and the House, it appears that one of CHUDHARY's relatives may use the cellphone associated with the Phone Number.

CHUDHARY.

## CHUDHARY'S RECONAISSANCE IN PREPARATION FOR AN ATTACK

23.     On or about August 24, 2019, FBI agents conducted surveillance of the

House.   The surveilling agents observed a man ("Individual-1") exit the House and proceed

on foot to the area in and around the Promenade.   During their surveillance of Individual-1,

the surveilling agents video-recorded Individual-1's activities in and around the Promenade.

Based on my review of the video, Individual-1 appears to be CHUDHARY.

24.     The surveillance video depicts CHUDHARY entering the Promenade

in the vicinity of 27th Avenue and Ditmars Boulevard.   As he walks in and around the

Promenade, CHUDHARY stops to take videos and photographs of the area with a cellphone.

At times, CHUDHARY appears to take videos and photographs in a surreptitious manner,

holding the cellphone close to his chest.   The video also depicts CHUDHARY taking videos

and/or photographs of, among other things, parts of the Promenade; the World's Fair marina

located in or around the Promenade; a security gate leading to the marina; a gas station and a

donut shop located in or around the Promenade; and a security camera located in the vicinity

of the donut shop.   I believe that CHUDHARY was conducting reconnaissance of the

locations in preparation for a knife attack there.   After CHUDHARY recorded those videos,

law enforcement officers surveilled him returning to the House.

## CHUDHARY'S PURCHASE OF A KNIFE AND TACTICAL EQUIPMENT IN PREPARATION FOR AN ATTACK

25.     From on or about August 25 through 26, 2019, CHUDHARY

communicated further with UC-1 and UC-2 regarding his plan to conduct a stabbing or

bombing attack on behalf of ISIS in the United States and his preparations for that attack.   In

12

these communications, CHUDHARY made clear that the attack would be imminent.

26.     On or about August 25, 2019, CHUDHARY again asked UC-1 for a video demonstrating the use of a knife in an attack" so he could "use it effectively," and stated that he had never "shot a real gun nor used a knife to spill the impure blood of a kafir." I understand that "*kafir*" refers to "non-believers" or non-Muslims.   CHUDHARY further explained that if he learned how to use a knife "properly," then he could "move and strike swiftly, all for the sake of Allah."

27.     Later in the conversation, CHUDHARY explained that he planned to change his clothes after the attack but that he might face challenges based on his plan. CHUDHARY was concerned that the only clothes that he possessed were those by which his family would recognize him.   CHUDHARY then asked UC-1 what clothes to buy, including whether he should buy "tactical kaki [sic] colored pants."

28.     CHUDHARY added that he considered committing the attack "near one of the Masjids and then enter the Masjid for changing clothes," where there was "a lot of darkness" and he could "wait therein if their police forces or army -- woe to them -- come, as they do after an attack by the Khilafah," and to leave his backpack and scooter to retrieve them later.   I know that "Masjid" refers to a mosque and that *"Khilafah"* refers to the leader of the "caliphate," or Islamic State.

29.     On or about August 25, 2019, CHUDHARY and UC-1 discussed what items CHUDHARY wanted to order from Online Retailer-1 and the use of a "locker" to send items that he wanted to order from Online Retailer-1 for the attack.   UC-1 thereafter created an account for CHUDHARY on Online Retailer-1 (the "Online Retailer-1 Account") and

preloaded it with cash.   CHUDHARY and UC-1 then discussed the purchase of different

items for the attack, including, among others, several knives, a strap for CHUDHARY's

cellphone, gloves, a mask, and clothing that CHUDHARY suggested should "blend in and

not [be] too eye catching."   After UC-1 informed CHUDHARY that he had put the items,

including three knives, in the Online Retailer-1 Account's shopping cart, CHUDHARY then

sent UC-1 screenshots of two knives and informed UC-1 that he was "having difficulty

choosing between" them.   Based on my review of a screenshot of the items placed in the

Online-Retailer-1 Account's shopping cart by UC-1, I have learned that UC-1 placed the

following items in the shopping cart: (a) an 11 inch black "Fixed Blade Tactical Knife"; (b) a

nine inch high carbon "Fixed Blade Knife"; (c) a two-piece "Tactical Combat Survival

Hunting & Neck Knives"; (d) a cellphone chest and head strap; (e) a polo shirt; (f) tactical

lightweight assault cargo pants; (g) a black face mask; and (h) a pair of "Covert Tactical"

gloves."

30.     CHUDHARY thereafter discussed with UC-1 when he should have the

items delivered and sent UC-1 a screenshot indicating that he had selected the shipment date

for Wednesday, August 28, 2019.   UC-1 then asked CHUDHARY how soon he intended to

commit the attack, to which CHUDHARY responded, "Very soon," and that he would do it

"possibly on a Jumu'ah."   I know that "*Jumu'ah*" refers to Islam's Friday prayer.

31.     Later that day, CHUDHARY sent UC-1 a screenshot indicating that he

had ordered a "420 High Carbon Stainless Steel Fixed Blade survival Tactical Knife," along

with a purchase confirmation addressed to the User Name for the Online Retailer-1 Account

indicating that the order would be delivered to an Online Retailer-1 retail location located in

14

Queens, New York during the first week of September 2019.

32.     During CHUDHARY's conversations with UC-1, CHUDHARY sent at least one screenshot demonstrating that CHUDHARY was ordering from Amazon Retailer-1 through a black computer, showing the edge of that computer, as depicted in Exhibit A.

33.     Between on or about August 25 and 26, 2019, CHUDHARY discussed with UC-1 the additional items he wished to purchase.   On or about August 26, 2019, CHUDHARY stated that he would cancel the order for the knife because he wanted to have it delivered more quickly—possibly in anticipation of an imminent terrorist attack. CHUDHARY then sent UC-1 a screenshot that appeared to be a page from Online Retailer-1, containing CHUDHARY's original knife order, with the phrase "Attempting to Cancel" at the top.   CHUDHARY subsequently informed UC-1 that he had found "one with a serrated edge," and sent UC-1 a screenshot of a knife with a serrated edge.   Later that day, CHUDHARY explained to UC-1 that the items would be delivered on Wednesday, August 28, 2019, and that he would use the Online-Retailer 1's "free locker delivery."

34.     CHUDHARY then told UC-1 that he ordered the items and sent UC-1 a screenshot that appeared to be from Online-Retailer-1, depicting, among other things, khaki-colored pants, a mask, a strap, and gloves.   Based on a review of Online Retailer-1's records, I have learned that, on or about August 26, 2019, the Online Retailer-1 Account ordered the following items to be delivered to an Online-Retailer-1 locker located in Queens, New York: (a) a 420 High Carbon Stainless Steel Fixed Blade Survival Tactical Knife; (b) a cellphone chest and head strap; (c) tactical lightweight assault cargo pants; (d) a black face mask; and (e) a pair of "Hard Knuckle Full Finger Tactical Gloves."

35. On or about August 29, 2019, law enforcement officers conducted surveillance and observed CHUDHARY depart the House and travel to the Online Retailer-1 retail location located in Queens, New York to which he had ordered the Items. Law enforcement officers thereafter observed CHUDHARY approach the Online Retailer-1 locker while in possession of two cellphones. Law enforcement officers conducted a probable cause arrest of CHUDHARY as he attempted to open the locker. At the time of CHUDHARY's arrest, a protective sweep of his person and inventory search of his belongings revealed that he was not in possession of a computer or a scooter.

36. Upon his arrest, CHUDHARY was informed of and waived his Miranda rights. CHUDHARY stated, in sum and substance, that he lived on the first floor of 29-11 Butler Street, East Elmhurst, New York with his family and that he stored his scooter in the basement of the SUBJECT RESIDENCE. CHUDHARY further stated that he possessed a Macintosh laptop computer, a Windows computer, and a tablet in the SUBJECT RESIDENCE. I believe some or all of these devices were used by CHUDHARY to communicate with UC-1 and UC-2 and to research his planned terrorist attack.

37. Based on my training, experience, and participation in this and other investigations, I know that individuals engaged in terrorism-related activities frequently maintain in their residence records and information relating to the specifics of their intended plots, along with weapons, tactical gear, and other items used or intended to be used for such offenses, as well as contact information for any co-conspirators. Here, CHUDHARY has purchased online a knife and other tactical gear in preparation for an intended attack, which gear it appears he intends to subsequently transport back to the SUBJECT RESIDENCE in

16

preparation for the attack.   In addition, each time agents have surveilled CHUDHARY

recording videos that he has subsequently sent to UC-1 and UC-2 of proposed attack

locations, CHUDHARY has left from and returned to the House thereafter, apparently

bringing his cellphone with him from the House in order to make the video recordings.

Furthermore, agents have surveilled CHUDHARY entering and leaving the House, and

therefore are aware that CHUDHARY has been at home during his conversations with the

UCs, indicating that CHUDHARY is communicating in furtherance of the Subject Offense

using a computer located in the House.   Based on the foregoing, I respectfully submit that

there is probable cause to believe that CHUDHARY is engaging in, and has engaged in, the

Subject Offense, and that the Subject Premises contain fruits, instrumentalities, and evidence

of the Subject Offense.

A.  Probable Cause to Seize and Search CHUDHARY's Electronic Media

38.     Based on my training and experience, I know that individuals who

engage in terrorism-related offenses store records relating to their illegal activity and to

persons involved with them in that activity on electronic devices. Such records can include,

for example logs of online "chats" with co-conspirators; email correspondence; contact

information of co-conspirators, including telephone numbers, email addresses, and identifiers

for instant messaging and social media accounts; financial and personal identification data,

including bank account numbers, credit card numbers, and names, addresses, telephone

numbers, and social security numbers. Individuals engaged in the Subject Offense often store

such records in order to, among other things, keep track of co-conspirators' contact

information and communications related to the Subject Offense and store financial data to

purchase weapons, explosive components, tactical gear, and other materials for use in the Subject Offense.   As noted above, CHUDHARY has engaged in multiple conversations over electronic media in furtherance of the Subject Offense using at least two encrypted applications, apparently using the computer described *supra* at paragraph 32, and has used at least one cellphone to record videos of locations in which he intends to carry out an attack. He has subsequently sent those videos over electronic media to the UCs, along with videos of bombing attacks, and documents in support of ISIS.   In addition, at the time of CHUDHARY's arrest, he was in possession of two cellphones.   Moreover, many applications, including messaging, email, and social media applications, often automatically store information on electronic devices for certain periods of time, if not indefinitely.

a. TECHNICAL BACKGROUND

39.    As described above and in Attachment B, this application seeks permission to search for certain items that might be found in the SUBJECT RESIDENCE, in whatever form they are found.   One form in which records might be found is data stored on a computer's hard drive or a cellular telephone or other storage media.   Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

40.    I submit that if a computer or cellular telephone or storage medium is found in the SUBJECT RESIDENCE, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

(1)    Based on my knowledge, training and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the internet.

18

Electronic files downloaded to a storage medium can be stored for years at little or no cost.   Even when files have been deleted, they can be recovered months or years later using forensic tools.   This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

(2)     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.   In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

(3)     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.   To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.   Computer users typically do not erase or delete this evidence, because special software is typically required for that task.   However, it is technically possible to delete this information.

(4)     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

41.     As further described in Attachment B, this application seeks permission to locate not only computers or cellular telephones that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers and cellular telephones were used, the purpose of their use, who used them, and when.   There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT RESIDENCE because:

19

(1)     Data on the storage medium can provide evidence of a file that
        was once on the storage medium but has since been deleted or
        edited, or of a deleted portion of a file (such as a paragraph
        that has been deleted from a word processing file). Virtual
        memory paging systems can leave traces of information on the
        storage medium that show what tasks and processes were
        recently active.   Web browsers, email programs, and chat
        programs store configuration information on the storage
        medium that can reveal information such as online nicknames
        and passwords.   Operating systems can record additional
        information, such as the attachment of peripherals, the
        attachment of USB flash storage devices or other external
        storage media, and the times the computer was in use.
        Computer file systems can record information about the dates
        files were created and the sequence in which they were
        created, although this information can later be falsified.

(2)     As explained herein, information stored within a computer,
        cellular telephone and other electronic storage media may
        provide crucial evidence of the "who, what, why, when,
        where, and how" of the criminal conduct under investigation,
        thus enabling the United States to establish and prove each
        element or alternatively, to exclude the innocent from further
        suspicion.   In my training and experience, information stored
        within a computer, cellular telephone or storage media (e.g.,
        registry information, communications, images and movies,
        transactional information, records of session times and
        durations, internet history, and anti-virus, spyware, and
        malware detection programs) can indicate who has used or
        controlled the computer, cellular telephone or storage media.
        This "user attribution" evidence is analogous to the search for
        "indicia of occupancy" while executing a search warrant at a
        residence.   The existence or absence of anti-virus, spyware,
        and malware detection programs may indicate whether the
        computer was remotely accessed, thus inculpating or
        exculpating the computer owner.   Further, computer, cellular
        telephone and storage media activity can indicate how and
        when the computer, cellular telephone or storage media was
        accessed or used.   For example, as described herein,
        computers typically contain information that log: computer
        user account session times and durations, computer activity
        associated with user accounts, electronic storage media that
        connected with the computer, and the IP addresses through
        which the computer accessed networks and the internet.   Such

20

information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer or cellular telephone may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer or cellular telephone may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information within the computer or cellular telephone may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

(3)     A person with appropriate familiarity with how a computer or cellular telephone works, can, after examining this forensic evidence in its proper context, draw conclusions about how computers or cellular telephones were used, the purpose of their use, who used them, and when.

(4)     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information

21

necessary to understand other evidence also falls within the
scope of the warrant.

(5)     Further, in finding evidence of how a computer or cellular
telephone was used, the purpose of its use, who used it, and
when, sometimes it is necessary to establish that a particular
thing is not present on a storage medium.   For example, the
presence or absence of counter-forensic programs or anti-virus
programs (and associated data) may be relevant to establishing
the user's intent.

42.     In most cases, a thorough search of a premises for information that
might be stored on storage media often requires the seizure of the physical storage media and
later off-site review consistent with the warrant.   In lieu of removing storage media from the
SUBJECT RESIDENCE, it is sometimes possible to make an image copy of storage media.
Generally speaking, imaging is the taking of a complete electronic picture of the computer's
data, including all hidden sectors and deleted files.   Either seizure or imaging is often
necessary to ensure the accuracy and completeness of data recorded on the storage media,
and to prevent the loss of the data either from accidental or intentional destruction.   This is
true because of the following:

(1)     The time required for an examination. As noted above, not all
evidence takes the form of documents and files that can be
easily viewed on site.   Analyzing evidence of how a computer
or cellular telephone has been used, what it has been used for,
and who has used it requires considerable time, and taking that
much time on premises could be unreasonable. As explained
above, because the warrant calls for forensic electronic
evidence, it is exceedingly likely that it will be necessary to
thoroughly examine storage media to obtain evidence.
Storage media can store a large volume of information.
Reviewing that information for things described in the warrant
can take weeks or months, depending on the volume of data
stored, and would be impractical and invasive to attempt on-
site.

22

(2)   Technical requirements.   Computers and cellular telephones can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.   Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.   The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the SUBJECT RESIDENCE. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

(3)   Variety of forms of electronic media.   Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

43.   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

44.   Because CHUDHARY is believed to reside with his family at the SUBJECT RESIDENCE, it is possible that the SUBJECT RESIDENCE will contain electronic media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.   If agents conducting the search nonetheless determine that it is possible that the things described in this warrant could be found on any of those computers, cellular telephones or storage media, the warrant applied for would permit the seizure and

review of those items as well.   Agents will take all reasonable steps to identify the owner

and/or user of the electronic media.

CONCLUSION

45.     I submit that this affidavit supports probable cause for a warrant to

search the SUBJECT PREMISES described in Attachment A, and seize the items described

in Attachment B.   I further request that this affidavit and the search warrants be filed under

seal as disclosure of this application would give CHUDHARY an opportunity to destroy

evidence, harm or threaten victims or other witnesses, change patterns of behavior, notify

confederates, and flee from or evade prosecution.

MICHAEL VECCHIONE
Special Agent
Federal Bureau of Investigation

Sworn to before me this
29th day of August, 2019


_____
THE HONORABLE JAMES ORENSTEIN
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

1.      The property to be searched is THE PREMISES KNOWN AND

DESCRIBED AS THE FIRST FLOOR AND BASEMENT OF 29-11 BUTLER STREET,

EAST ELMHURST, NEW YORK 11369 (the "SUBJECT RESIDENCE"), AND ALL

COMPUTERS, CELLULAR TELEPHONES AND ELECTRONIC STORAGE MEDIA

CONTAINED THEREIN.

2.      The SUBJECT RESIDENCE is located within a blue and white house

(the "House") located on 29-11 Butler Street, East Elmhurst, New York, surrounded by a

white fence.   The House is accessed via a walkway past the white fence and up a few stairs

on the right side of the House.   The front of the House has the numbers "2911" in black

lettering on a white column.   The Subject Residence is believed to be located on the first

floor and basement of the House.



**ATTACHMENT B**
<u>Particular Things to be Seized</u>

All information described below that constitutes evidence, fruits and instrumentalities of attempting to provide material support to a terrorist organization, in violation of Title 18, United States Code, Section 2339B.

1.    A scooter.

2.    The black computer depicted in Exhibit A (hereinafter, "COMPUTER"), including the following specific items:

    a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.  evidence of the lack of such malicious software;

    d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

27

e.  evidence indicating the computer user's state of mind as it relates to the crimes under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this attachment.

n.  documents and records indicating support of jihad or martyrdom, research into terrorist organizations, research on explosive devices, weapons, firearms, substances and components that can be used to construct an explosive device,

planning efforts, research into terrorist attacks, diagrams of explosive devices, information relating on how to construct an explosive device, information relating to specific people and property that would be targets of an attack, and the identities of co-conspirators.

All of which constitute evidence, fruits and instrumentalities providing material support to a terrorist organization, in violation of Title 18, United States Code, Section 2339B.

# EXHIBIT A

